May it please the Court, my name is John Sargettis, attorney at United Law Center in Roseville, California. And I'd like to reserve about five minutes again for rebuttal. I'm sorry, your name again was? John Sargettis, S-A-R-G-E-T-T-I-S. Danny Baric was the attorney from our office who handled this entire matter, but he left our firm about a week and a half ago. Did you check in with the clerk? Yes, I checked in with the clerk. I indicated my name was John Sargettis. Is it appropriate to so indicate that to the Court now? Danny Baric was the attorney who was at our office, and he left our office going back to just about a week and a half ago. I'm the partner of United Law Center here, and I'm here to present the oral argument before we entertain it. Is it the same firm? Exactly, Your Honor, same firm, of course. It's United Law Center, and I am the partner of United Law Center. Are you on the brief? No, my name is not on the brief. It's only Danny Baric, and specifically it makes reference to United Law Center, but I am the partner of United Law Center, along with Stephen Fundos. The lawyer of record, then, would be Brock. I apologize to the Court, Your Honor. Why didn't you take care of this before this morning? I assumed that it had been done. We've also just moved our ---- Why would you assume that it had been done when ---- I would have believed that our ---- He left the firm? Yes, he left the firm. And it appears now that this Court should have been so notified that a different person, not Danny Baric, would be here to make the oral argument. I have fully reviewed the matters. I'm the partner at United Law Center. I can fully argue this matter before the Court, and am willing to do that if the Court would still continue entertaining argument for me on a couple of limited points I'd like to make. Of course, we were the ones who did the opening brief and the reply brief, and so we've basically said everything we want to say, but I want to make a couple of points here if the Court would continue to entertain that. We heard nothing. I have never faced this situation before, Your Honor. I'm not sure what the Court wants to do in this circumstance here. It's apparently our office's fault here for not notifying the Court here that I would be appearing about a different outside counsel. I am the partner of United Law Center, a professional law corporation. Well, I mean, the problem is you're not counsel of record. You know, you can't just walk in. I fully understand and respect that, Your Honor. I know we have made, of course, as I mentioned a second ago, it's our appellant's brief, our reply brief. We already got the chance to make the first and the last argument. I would only, and again, oral arguments here to maybe try to persuade the Court based upon what was already stated, but I know that this matter has been definitely very detailed and fully briefed by Mr. Barrick. It's up to Your Honors. All right, look, we'll let you make your few points. I'll let you make your few points, but you may hear from us after this argument. And I apologize to the Court, Your Honor. I'm the partner. Therefore, the buck stops here. You're going to have to confirm with the clerk when you sit down, give her all the information, and then we're going to check it out. Just go ahead and make your points. I'll do that very briefly here in light of the fact that we've already presented the opening brief and the reply brief. We're here just to determine whether or not there were triable issues of fact in this case upon which the Court, in hearing this matter de novo here, should have granted summary judgment. I'd like to make the point that a foreclosure sale took place. A foreclosure sale in California is unlike any other judicial remedy. As a matter of fact, it's not a judicial remedy. California is a nonjudicial, as the Court very well knows, a nonjudicial foreclosure state. So when that foreclosure sale takes place and that trustee's deed is issued, that is tantamount to an eviction because the consequence of a trustee's deed is that thereafter, pursuant to California eviction laws, a three-day notice is given and an eviction lawsuit is filed. And it's very clear California authority that you cannot go to the eviction court arising out of a foreclosure and try to defend that case on the grounds, well, the foreclosure was done wrongfully, Your Honors, because we were in the middle of a modification. Eviction courts do not hear that. In the eviction courts, it's clear by California law, all the bank plaintiff has to do is flash in front of the court the trustee's deed. That's it. The only possible defense in an eviction case is, oh, you didn't give the proper 90-day notice or 20-day notice. So we have a circumstance in which in making a decision by a lender to foreclose, it's a severe consequence unlike any other consequence in California law here where it is tantamount to an eviction of a person from their real property residence from which there is basically, in effect, no appeal from. They would have to try to file a lawsuit before the foreclosure sale. I just think that's an important point in the context here of did the bank, excuse me, it isn't whether the bank had the right to foreclose here, it's are there triable issues of fact. What are the triable issues of fact that you have here? And what they are, and I'll point to the most significant one, which I see in the brief was very categorically stated later on in the argument, but the number one argument was that within the bank's own records, we look at the fact that there's the May 8th note that says, quote, in large print, currently under mod review. And so what claim does that go to? Because he wasn't aware of that note until afterwards, right? Understandably. Even if he wasn't aware until afterwards, if that came up in discovery, it's still the statement of the bank that this person here is still under mod review. So what claim does that relate to? Because for an intentional or negligent misrepresentation claim, he has to rely on it. And since he didn't know about it, how did he rely on it? On that, he didn't rely on. Okay. So that doesn't go to a misrepresentation claim. Yes. It goes to the negligence claim, but it wouldn't go to the negligent misrepresentation because they didn't make a representation to him in that May 8th letter that he was currently under mod review. However, there was a whole series of events that took place before then. And I ask the Court not to consider any one individually because any one individually may not be sufficient to create a triumphal issue of fact. But when you go through the historical analysis here, that the phone call with Cerverta where he was told in a note, it's innocuous, to say, let's start the ball rolling again. And this is the initial interview. So after the denial or the withdrawal, I guess, I guess that happened in February, was there a – did he submit an application? And where is that in the record? There's nothing in the record that say that he submitted a new application. Okay. So in February of Wells Fargo 2012, he sent a letter saying, we're not able to help you and a mortgage assistance solution and normal collections process will resume. And that's the – So after that, after he received that letter, did he submit a new application? Not a new application, but he submitted the documents that they requested him to submit. So did you – was there any basis for saying that after he was sent a letter saying we can't help you and we're going to resume collection process, why does the Supreme Court, after submitting additional documents, create a genuine issue of material fact as to, I guess, whether he negligently – whether Wells Fargo negligently foreclosed, breached its duty by foreclosing? You know, I believe it's because he was reasonably led to believe, and we're not trying the issue here, could a jury reasonably be led to believe that by the submittal of the documents and the combination of events? How, when he had submitted documents in the past, they had postponed the sale. How it had been postponed a couple times before. How, when he was told by Severda in the telephone call to get the ball rolling again, he would have to submit – But he had no application pending. So far as you know, there was no application for a loan modification pending at that point. There was a previous – when we say an application pending, an application in connection with the modification process is a number of documents. It is, to see the application form itself, the request, the RMA, a request for modification assistance. So help me understand the HAMP process. So Wells Fargo has several letters, and one of them says, when we get a complete document filed, then we'll start our HAMP review. And during the HAMP review, we won't foreclose. But before the HAMP review, while they're still collecting documents, I didn't see in the Wells Fargo letters that there were any promises of not foreclosing. So maybe walk me through the HAMP process and tell me what the law requires, what Wells Fargo's policies are, and how that would work to create an expectation that after being told we can't help you, that he was nevertheless in HAMP review. Under the HAMP policy and under California law, when, of course, when a party's in the middle of a – say in the middle of a modification application, when they've submitted a – So is there an application? Is there like a – do you fill out an application and submit it to your lender, or do you send in an email asking? Or what – how would you start the pre – I guess it's pre-HAMP review. How does that process start? It's the actual submittal in the bank's form of a modification application. Okay. So there's some sort of modification application that's actually submitted. It is. And then the bank starts collecting documents? Is that the next step? They don't start collecting documents. It is the borrower who has to submit the documents, has to submit an RMA, request for modification assistance. Okay. And how does the borrower know which documents to submit? Does the bank tell them? Absolutely. Okay. So there's usually a two- or three-page form in which it specifically states you're supposed to list your income, your expenses, all under penalty of perjury. And you have to attach – and it's not good enough just to submit an application. You have to submit the backup documentation, bank statements, tax returns, 4506T tax forms. So Wells Fargo says, once we have all the documents that we've requested, then we'll start the HAMP review, and we won't foreclose while you're in HAMP review. Is that – that was what I saw in the letters. Is that correct? That is correct. Okay. And then if it's – it determines – like twice it determined that Mr. Falks didn't meet the HAMP criteria for getting a loan modification and sent out a letter saying you don't meet the criteria because we can't fashion a payment that meets your – your income. And then it gives him a 30-day window in which to appeal and says we won't foreclose within that 30 days. And then they say they'll resume collection activities. Is that correct? That's what I saw from looking at the letters. Yes. That's basically correct. And so, in effect, by the September – excuse me, the February 9th letter when he was basically turned down, but thereafter, after February 9th – So does he fill out another application form after the – he was turned down in February where they said we can't help you? No. It's not an – another application form. So – so you're saying that there was an application form somehow pending even though they had said we deem it withdrawn and then said we can't help you? All right. When we say there's an application form that's submitted – and let's just assume in the first place, if we can, that there was – there was at some point in time before February 9th a so-called complete application submitted. Well, we know that. He was in HAMP reviewed twice, right? Yes. And he was in HAMP reviewed twice and he was denied both times for failing to meet the financial criteria. Right. And sometimes after the February 9th or a letter saying you're denied for a modification, which could have been for whatever reason they denied him for – Well, they had to and they said what the reason was. The reason was you can't meet the financial criteria. And not meeting the financial criteria then still leaves the door open for them to continue with a modification process. And that's a very common fact, as established here, because he was turned down once and I believe it was postponed a couple of different times here. So it's a very common – Did the bank ever send word to him that they're modifying it or is this get the ball rolling the only evidence you have about that? It's not just getting the ball rolling. It's the fact that documents were actually submitted. The bank doesn't necessarily accept documents just because you want to send them in. But following a telephone conversation in which it's documented and he states that he was told here, we're initiating the interview. It is to get the so-called ball rolling again. Well, what is getting the ball rolling? It isn't just trying to call just to talk about nothing here. It could only and was only in connection with a modification application. And so when a bank turns down a borrower, lender turns down a borrower because, as was stated, you don't meet the financial condition. What does that generally mean? Your income isn't sufficient. Your expenses are too high. But that doesn't preclude them. It's not like you get one shot with a bank and that's it. Or they – actually, they probably could tell you – Can the bank never foreclose? As long as you keep sending in financial documents, the bank can never foreclose. Is that your position? No, that isn't the case. That seems to be what the suggestion is because he got multiple denials and the final one said, we can't help you. And then he continued to send documents in. Yeah, but continuing to send documents in there, if it turned – Without an application, there was nothing. It never got to the point here where they ever sent him a letter before the current foreclosure that says, oh, we've reviewed you again, and by the way, your financial situation hasn't changed. Or even if it has changed, it isn't sufficient. Do they have to do that if they haven't initiated HAMP review? In the other cases, they said, okay, we have all your documents. We're initiating HAMP review and we won't foreclose. But they never sent him that letter in February. But here, with the events that occurred both before April 2016 – before February 2016 and afterwards, where he has not only a phone call, but it's also even within the bank's notes, and I think taken as a totality, even the bank's notes that he's currently under mod review, and even the May 8 note, foreclosure review. And I understand that that's not something that he was told, but it's crucial here because if the bank is admitting he is within a modification review, then that at least creates a triable issue. You said that the phone call, let's get the ball rolling for the interview. Yes. Did that interview ever take place? I don't know if the – I can't say there's evidence that was – because all we're there was an interview that took place. Don't you think that would be significant? It is significant. To get the ball rolling again, we've got to start with an interview. Did the interview take place? I don't know if there was evidence here that was presented, whether this interview, the so-called interview had taken place. But the documents – Well, your client didn't file an affidavit that he did have an interview, did he? I don't recall if there was a specific affidavit to that effect. But clearly, the evidence – he submitted documents subsequent to that. And if you look at – and again, I think the most crucial point to reiterate here is – Did he submit the documents or did the Consumer Counseling Center? Excuse me. Through the – his agent, the Consumer Counsel, submitted the documents. And if it's the bank in the May 8th that says you are under – we are taking it under modification review, that's a crucial admission on their part that they at least believed that whatever he submitted afterwards, whether the interview had taken place or hadn't taken place, or what documents he had submitted, if they're saying he's under mod review and there's nothing after that prior to the foreclosure case that rescinds that, then I would strongly maintain that there remained, with a combination of all the events here, at least triable issues of fact for a jury. Thank you, Your Honor. We'll hear from the other side. Good morning, Your Honor. Thank you. May it please the Court, Robert Bailey for Wells Fargo. I'll try to keep it short. I can tell from the questioning that the Court really understands the issues. One of the key documents that I'd like to call the Court's attention to is the letter that Wells Fargo sent to Mr. Fox when he was complaining about his – the process. So they sent him a letter in October 2011, and it's at page 17 to 720 of the record, in which they describe in detail a timeline of five reviews. Actually, by this time, there's only four. The February 2012 is the fifth one, and they tell him in the letter that – they give him a list. Here's the documents that we're going to need to have a complete application. They tell him, if you're going to apply again, your data has to be within 30 days old. They tell him that we do an interview in order to – they don't use in this letter, but it's pretty clear, get the ball rolling. So there are steps that are necessary for a complete application. And, of course, the Court hit the nail on the head. It's the idea that borrowers can just submit documents. I just submit documents. That means the foreclosure is postponed forever. No, it's – and this is exactly what California's Homeowners' Bill of Rights enacted. It's when you get a complete application. When you have all of your documents, you've done your interview, that's when the hold goes into place, stopping the foreclosure. Is this the letter that he says he sent some materials in in response to? No, he – Or is this some other letter? He wrote to, apparently, Senator Feinstein and to the Office of the Comptroller of the Currency saying, Wells Fargo should have given me a loan modification. Wells Fargo responds to that, first of all, by trying to call him several times, and then when that fails, by writing him a letter detailing, here's what we did and here's how we got to the point where we are now. He sent in the documentation in 2012 in response to a letter that is on page 734, January 23, 2012, where they say, we need your lease. You're claiming income. Essentially, it's a tragedy for Mr. Falks, but he couldn't afford the house. He lost his job. He had an injury. At one point in one of his modification applications, he literally had zero income. In another one, he had $350-some a month, and yet Wells Fargo still was not foreclosing. It took two years from the time he missed his payments until the time the foreclosure was going. They kept it going, kept reviewing. He then said, well, I've got a border, and that's increased my income. So in this January 23, 2012 letter, they say, okay, give us proof that you have a lease, that there's some rent being paid, and we're also going to need to see the bank statements to show that this person is actually paying the rent, that you didn't just make up a lease. And they extend the time for him to send that in. They push out the foreclosure. They push out the dates so that they give him more time to do that, and he doesn't. So then he sends in documentation after the deadline and after he gets the letter saying, sorry, we're done, and counsel tried to characterize that as well. He must have had an interview because why else would he send the documents? We're talking now after February 9th. Right. And he sent them because his cover sheet, in fact, says, at long last, his fax says, at long last, here is the lease. So let me ask you this. So after February 9th, as I understand it, he says that on February 20th he received his phone call. Voicemail, right. Right, or whatever it was. Let's meet and interview, get the ball rolling. Right. Did an interview ever take place? No. And, in fact, we presented as best we could from our records trying to prove a negative. So we presented all of our notes logs and probably overly burdened the court with a bunch of phone calls where bank representatives are leaving voicemails. We need to contact you. We'd like to do an interview. Our notes logs say. See, that suggests that despite the fact that they had denied it on February 9th, that they were willing to start it over. Well, what they were willing to do, and the February. He says, well, okay, we'll start over. And the agent calls and says, to do that, we've got to get the ball rolling, got to have an interview. Right, so the February. I mean, it sounds like despite everything that they did in the past, that they could start the process anew. They could theoretically, I suppose, start the process anew. But what the documentation shows, the February 8th letter, and then right after that, this is at page 740, there's a February 13th letter saying, there's other things that we will consider you for than a HAMP review. And those things, as the October letter also makes clear, also will involve an interview, a short sale, a deed in lieu of foreclosure, what is in the industry colloquially called cash for keys. In other words, we'll let you stay for, or relocation assistance, which they did offer him, even $20,000. We'll let you stay for a certain amount of time. At the end of that time, you will have moved out of the house and will do either a friendly foreclosure, which means it's not at all contested, or you'll just give us the deed to the property. What about this May 8th, 2012 note from Wells Fargo, which is confusing? It says, foreclosure review, HAMP solicitation eligible, recommendation, loan is currently under mod review, proceed with foreclosure action on Wachovia 2nd as there is enough equity. How do you explain that language? Well, there's the active review, which is essentially how the evidence came about. Whether somebody's in an active review, active HAMP review is when the process stops the foreclosure. When somebody is potentially in a modification review for one of the other programs, there's also a program called MAP2R, and you may have seen some references to it in there. It actually has some proprietary elements that wouldn't necessarily trigger a stop of the foreclosure sale, especially if there's been no change. When you've been reviewed five times and your situation is exactly the same, we can do it again, but we can still proceed to foreclosure if it looks like you're either not getting us the documents or what documents you've given us haven't changed at all. So you're saying that they might have been under loan modification review but not the sort of modification review that prevents going forward with foreclosure proceedings. Is that how you explain that? The note doesn't say it's a HAMP review, and it doesn't say it's an active HAMP review. Frankly what it is, and there's discussion of this from some of the, if the court really wants to get into the weeds of the testimony, you'll see to the left of the notation there's three letters, F-O-R. That's the foreclosure department putting a notation in there. If it's the loss mitigation department, the people who do the loan mod reviews, it will say LMT. So instead of asking a witness about this document, instead of asking a 30B6 witness to explain what this is, this is just some speculation that, okay, I'm going to yank this document out and I'm going to characterize it as an indication that he was under a HAMP, an active HAMP review. So whether or not the foreclosure department would accurately characterize what the loss mitigation department is doing as a complete mod review. In other words, it's not an acknowledgment by foreclosure that loss mitigation has a complete application. It really is just a notation that says he's still communicating with somebody about something. How much time expired between the time that this got the ball rolling and the foreclosure itself? That happened February 20th, and then the foreclosure was May 17th. A couple months or three months or something. Right. And that was another issue that was raised in the reply brief was that, oh, let me just finish a point there. As to whether or not the interview happened, counsel said he didn't know. Mr. Fox didn't put it in his declaration. They suggested that we should have proved that it didn't happen. We tried with phone calls and records. But, really, the easiest thing to do is look at the third amended complaint, page 807 of the record, lines 21 to 26. He says he tried multiple times to contact the bank after February 20th, 2012, and could never get a hold of anybody and had no contact. So he admitted that the interview did not take place. As to the delay between the phone call and when the foreclosure happened, that was another point made from the reply brief was that, well, we should have, Wells Fargo should have demonstrated that the reason for the delay of the foreclosure sale, that there was an April date and it got moved to May, Wells Fargo should have proved that the reason that happened was something other than the fact that they were Well, we did. The page 772 of the record is the notes log that was submitted with the openings brief. And it says, this is a February, this is the April 16th entry. It says, please be advised that the sale date has been postponed to allow for that statutory NTS, Notice of Trustees Sale, period. California law requires that the recorded Notice of Trustees Sale, NTS, must be at least 20 days prior to the sale date. So what happened was that the Notice of Sale was dated 3-26 instead of 4-16 sale date, which was 20 days, but it didn't get recorded until March 28th, which only would have been 18 days. So the sale was postponed, not because of anything that Mr. Fox did, but because it was within the 20-day period, and the statute requires that the sale cannot take place within 20 days of the recording of the Notice of Sale. I want to just change the subject for just one second. If we assume that, just assume for me for a moment, that there are tribal issues of fact with respect to the negligence allegation, does California law right now recognize a duty in this context? Not in this context. The California Courts of Appeals seem to be a little split. They are split, but what they do all agree on, Alvarez especially, is that it's got to be more than just the way that you're shuffling papers. You have to go out to the borrower. Alvarez, the bank there specifically, solicited the application, and by soliciting the application you put yourself in a different position to then accept a duty to process that application that you asked for. And the manner in which you do that, and one of the aspects that Alvarez directly looked at, and, again, Alvarez was a pleading case, and all of these cases that have addressed that issue of the duty are pleading cases. They looked at whether or not the borrower can establish some kind of prejudice. So applying the Biaconga factors, is there a certainty of harm that flowed from the fact that they misprocessed the application? And all of those plaintiffs pled that had they processed it correctly, I would have gotten my modification. There's no such allegation here, and there's certainly no evidence here, nor could there be. He had no income. He couldn't establish he had the rent. He was making $1,900 a month on Social Security, and this is a $700,000 loan. The record shows that the only way to adjust it is to get him to a 31% debt or housing income ratio. They would have had to give him a 0% interest for 70 years. He argues he was prejudiced because he could have sold the house or borrowed money from friends. Well, that's what he argued. But then when he submitted his declaration, he said he was prejudiced because or he relied on the statements because he was confident he would have gotten a mod, and therefore he didn't try to sell the house or get help from others. It's not that he didn't do those things because he thought he was going to be reviewed and that the sale was not going to happen during the review. He did those things because he thought wrongly that he would qualify for a mod. Okay. Thank you. Over to you, Your Honor. Thank you, Your Honors, for allowing me to be heard this morning here. Well, so the clerk advised me just a moment ago that we actually never received an acknowledgement from anybody from your firm about who was going to appear today. So I don't know kind of what happened in our processes. We usually are pretty much on top of that. But I don't want you to leave here without giving all the relevant information to the clerk. I certainly will, Your Honor. Thank you. Okay. Thank you. Just a couple of final points here. On the issue of the duty, the most recent California case, and I'll maintain and argue the trend is to allow a duty in connection with a modification process. And the most recent pronouncement is our own office's case in the Rosetta, R-O-S-S-E-T-T-A case. And so I believe there's a very strong indication that the Court should follow here that a duty exists here. But we have a, you know, our obligation is to try to figure out what the California Supreme Court would do. And they certainly have had a number of petitions for review, and not one has actually been granted on this particular exact point here. I think it should, and there's actually some pending from our office, but we don't know what's going to happen with those. But at least it appears that, and even some of the district courts here have held, based upon Alvarez, that there's a duty here. Even though there are, admittedly, other district courts that have held that there isn't. On the other way. Yes, yes. Okay. So here, the reference, I think counsel made reference to the post-February 9, the foreclosure sale for April 16 was postponed. So counsel's argument was, well, the reason why it was postponed was we can't do a foreclosure sale within so many days. No, there's a triable issue of fact here. There were documents that were submitted before that on April 13th. So do we know what the real reason is why they postponed the foreclosure sale? Is it because, oh, documents had been submitted, and so now we're actively reviewing them, or was it because the reason why was because we can't conduct a foreclosure sale? That's a triable issue of fact. Here, unfortunately, there was no post-April 13 or letter prior to the foreclosure sale similar to the February 9 letter that would have said, you know what, we've reviewed you again one more time, and sorry, you just don't qualify. That isn't the case here. The case here is strictly did they foreclose while it was still pending. How it would have turned out is not before the Court here. If he had been turned down again just prior to the May 17th sale date because you didn't qualify, that might have been a separate lawsuit. But the only issue here are the triable issues of fact, and based upon, I believe, a totality, particularly the bank's own note, which kind of belies the defendant's or Respondent's argument here that the reason why we postponed the sale was because we couldn't do the sale. If that's the case, where is that in the documentation here? It specifically said in their note, modification was under review. Okay. With that, I will submit it. Thank you very much. Thank you, Your Honor. With that, we will submit the matter, and that terminates our session for today. Thank you, Counsel.
judges: Siler, Paez, Ikuta